UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WAYNE J. OELZEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:06CV1734 TIA |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

The Court conducted a non-jury trial on this action commencing September 8, 2008 and concluding September 9, 2008, on which date the Court took the case under advisement. The Parties have since filed Plaintiff's Post-Trial Brief, Defendant's Post-Trial Brief, and Plaintiff's Reply to Defendant's Post-Trial Brief. The Parties consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

### Findings of Fact

On March 14, 2005, Wayne and Deanna Oelzen planned to travel by plane from St. Louis, Missouri to Baltimore, Maryland to visit their son, his wife, and their grandchildren. Sometime in the year 2000, Deanna Oelzen suffered a brain stem stroke which left her almost completely paralyzed from the neck down. She could move her right hand slightly to the right with the help of an assistive device. She had little control, however, over her arms. She retained her complete mental faculties and could communicate by speaking, although she could not speak in a loud voice. On March 14, 2005, the Oelzens' flight was scheduled to leave St. Louis for Baltimore at approximately Noon. On that morning, Wayne Oelzen dressed his wife in bed, and moved her by way of a Hoyer lift into a

traveling wheelchair. The wheelchair had a chest belt and a seatbelt, and Wayne Oelzen testified that he tightened both belts after placing Deanna in the wheelchair. He stated that he always fastened both belts when he placed her in the traveling wheelchair. The chest belt went over a sweater that Deanna was wearing, but underneath an insulated-type vest, which was zipped up to her neck in front. The chest belt was covered by the vest, and could not be observed without unzipping or moving the vest. The travel wheelchair had been purchased in 2001 after being used by a previous owner, and the chair had never been inspected or serviced by anyone from 2001 to the date of the accident. Further, Wayne Oelzen had never read any safety instructions or the instruction manual relating to the chair.

Wayne Oelzen's brother and sister-in-law, Richard and Mary Ann Herbert transported the Oelzens to the airport approximately two hours after Wayne Oelzen placed his wife in the wheelchair. Mary Ann Herbert also helped Wayne Oelzen transport Deanna through the security checkpoint and onto the airplane. Although Wayne Oelzen did not check the waist belt or chest belt after dressing his wife that morning, he said he was certain that both belts were fastened during the transport to the airport. Specifically, Deanna Oelzen did not lean forward when she was wheeled down the ramp of her brother-in-law's van. Mary Ann Herbert also said she believed that Deanna Oelzen's chest belt was fastened even though she never observed it under the vest, because she could not move Deanna forward in her wheelchair to tuck in her cape when they went outside that morning.

When they arrived at the airport, Wayne Oelzen, Deanna Oelzen, and Mary Ann Herbert were dropped off at the door, and they eventually proceeded to the security checkpoint. Transportation Security Administration employee, TSO Jamie Bergheger, met them at the security check point and took Deanna Oelzen by way of her wheelchair into the security area. She then waited for Wayne

Oelzen and Mary Ann Herbert to clear the magnetometer and approach the conveyor belt of the x-ray machine to collect their belongings. During this time TSO Bergheger asked Deanna Oelzen if she wanted to have a private screening in a private area, and, when she could not hear Deanna's response, asked Mary Ann Herbert if they wanted a private screening. After a brief discussion, Deanna Oelzen and Mary Ann Herbert told TSO Bergheger they did not want a private screening. TSO Bergheger told them that she would move Deanna Oelzen a few feet to the open screening area and would screen her there by patting her down, using the back of her hand in any sensitive areas. TSO Bergheger then moved Deanna Oelzen to the public screening area and began to screen her as best she could given Deanna's almost complete paralysis from the neck down. TSO Bergheger said that by the time she started the screening, Wayne Oelzen and Mary Ann Herbert were in the general area where the screening was taking place. TSO Bergheger did not want to move Deanna Oelzen in the wheelchair for fear of injuring her. Specifically, TSO Bergheger stated that she did not want to attempt to lean Deanna forward in the wheelchair to check behind her back for fear of injuring her neck. During a pat down search of the outside of Deanna Oelzen's body, TSO Bergheger observed a waist belt on the wheelchair to be fastened, but never saw a chest belt. Further, she was not even aware that the wheelchair contained a chest belt. She stated that she did not move any of Deanna Oelzen's clothing while performing the security check. When TSO Bergheger arrived at the wheelchair seatbelt, she flipped over the belt to see what was on the other side of it, and then flipped it back over. She did not unlock the belt, and it is a policy of TSA never to unlock wheelchair belts for fear that the person will fall out of the wheelchair. TSO Bergheger then asked Wayne Oelzen if he wanted to "finish up" Deanna Oelzen by putting on her shoes. He stated that he desired to do so, and TSO Bergheger left the area. TSO Bergheger stated that as far as she knew, the seatbelt was still

fastened when Deanna Oelzen left her area and, as stated above, never observed, much less touched, the chest belt.

After the screening, Wayne Oelzen did not check the belts to see if they had been unfastened during the screening process. He had no reason to believe that the belts had been unfastened because Deanna's vest was not unzipped, nor were her clothes wrinkled or moved. Further, according to Wayne Oelzen, Deanna Oelzen was aware that her belts needed to be fastened at all times and, if she was aware that they had been unfastened during the screening process, she would notify Wayne.

The Oelzens and Mary Ann Herbert then went to the priority boarding area of Southwest Airlines Gate E-14. Deanna Oelzen and Mary Ann Herbert were seated next to each other for about fifteen minutes while waiting to board the flight. During this time, Deanna never said anything about her belts being unfastened.

Kelly McDougal was the Operations Manager working at Gate E-14 on that date. Ms. McDougal has been employed by Southwest Airlines for sixteen years and has extensive experience and training in boarding passengers with disabilities onto Southwest Airlines airplanes. Ms. McDougal stated that if at all possible, she does not allow passengers to take their own relatives down the jet way. Instead, her constant practice is to push the wheelchair down the jet way herself to the door of the plane with the family following her. On this date, she noticed the Oelzens waiting in the pre-board area, and she told Wayne Oelzen, "If you will hold on just a minute, I'm going to take her down so stay right there." Ms. McDougal then became distracted by a problem with another passenger, possibly with a small child. When she turned around to check on the Oelzens, they were already headed down the jet way. As she followed the Oelzens, it became apparent to her that Wayne Oelzen had lost control of the speed of the wheelchair and was proceeding much too quickly

4

down the jet way. He was going so fast that Ms. McDougal was afraid he would catapult over the wheelchair when it came to the bump in the telescoping section of the jet way. She yelled for Wayne Oelzen to stop, and she attempted to grab him in order to slow him down. She was unable to do so, and when Wayne Oelzen arrived at the telescoping section, the wheelchair came to an abrupt halt. At this point, Deanna Oelzen was ejected completely out of her wheelchair, and was almost "airborne." There was a thud when she hit the ground, and her head appeared to take a major part of the impact.[1]

Wayne Oelzen and Mary Ann Herbert immediately attempted to assist Deanna Oelzen, while Ms. McDougal called for the paramedics on her operations radio. They observed that Deanna was rendered unconscious by the impact with the jet way. Mary Ann Herbert said that she believed Deanna was unconscious for what "seemed like" a long time. Eventually, Deanna Oelzen regained consciousness shortly before the paramedics arrived. The paramedics checked on Deanna and found her vital signs to be normal. Nevertheless, they recommended that she go to a hospital to be examined more fully. However, Deanna and Wayne Oelzen decided to proceed with their trip, because Deanna was feeling better. When asked by the paramedics, the Oelzens did not tell the them that Deanna lost consciousness. A loss of consciousness, according to the paramedics, increases the likelihood that a serious injury has occurred, and the paramedics would have been more insistent that she go to a hospital had they been aware of this fact.

---

[1] To the extent that Ms. McDougal's testimony conflicts with the testimony of Wayne Oelzen and conflicts with testimony of Mr. Oelzen and Ms. Herbert, the undersigned accepts the testimony of Ms. McDougal in its entirety. Ms. McDougal has no personal or monetary interest in this case. Neither McDougal nor Southwest Airlines is a party to this lawsuit. In addition, Ms. McDougal is a trained professional, who vividly recalls this matter because of the violent and traumatizing way in which it occurred. She testified credibly and in detail about this incident, and the undersigned will rely on that testimony in support of the findings of fact.

After the paramedics left, the Oelzens proceeded to board the aircraft. When Deanna Oelzen was safely in her seat, and while Wayne Oelzen was checking the wheelchair in the front of the plane, Mary Ann Herbert asked how Deanna's seatbelts had become unfastened. According to Mary Ann Herbert, Deanna told her that the "ladies in security opened the belts after they asked me to lean forward and I said I couldn't." After the plane left for Baltimore, Deanna Oelzen began to show symptoms of a severe headache, and, shortly after landing in Baltimore, she became unconscious and was transported to the hospital. She died the next morning with what was diagnosed as a traumatic brain injury.

## Procedural History

On December 5, 2006, Plaintiff filed a Wrongful Death Complaint in federal court under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* Plaintiff instituted the claim as the Decedent's lawful husband under the Missouri Wrongful Death Statute, Mo. Rev. Stat. § 537.080. Plaintiff alleged that the death of his wife, Deanna Oelzen, was caused by the negligent and wrongful acts or omissions of employees of the United States Government while acting in the course and scope of their employment. Specifically, Plaintiff alleged negligence against employees of the Transportation Security Administration ("TSA"), a component of the Department of Homeland Security. Plaintiff claimed that as a direct and proximate result of the Decedent's wrongful death, Plaintiff sustained damages including pecuniary losses, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training and support.

## Conclusions of Law

Because the alleged act or omission occurred in Missouri, the Court will apply Missouri substantive law to Plaintiff's negligence claim. 28 U.S.C. § 1346(b). Plaintiff alleges that the

6

employees of Defendant were negligent in performing Deanna Oelzen's screening at Lambert-St. Louis International Airport, thus causing her to fall from her wheelchair, strike her head, and sustain a subdural hematoma which lead to her death. Under Missouri law, to succeed on a wrongful death claim under a negligence theory, a plaintiff must establish: "(1) the defendant owed a duty of care to the decedent; (2) the defendant breached that duty; (3) the breach was the cause in fact and the proximate cause of [her] death; and (4) as a result of the breach, plaintiff suffered damages." Heffernan v. Reinhold, 73 S.W.3d 659, 665 (Mo. Ct. App. 2002) (citation omitted); see also Abney v. City of Park Hills, Missouri, No. 4:06CV1258-DJS, 2007 WL 2955578 at *5 (E.D. Mo. Oct. 5, 2007).

Defendant concedes that it had a duty to protect Deanna Oelzen from injury, as she was traveling through an airport security checkpoint in a wheelchair with restraints and was subject to an individual inspection by a TSA screener. Liability in this case hinges on whether Defendant breached that duty and, if so, whether a causal connection exists between the breach and Deanna Oelzen's death.

### **Breach of Duty**

Plaintiff has presented no direct evidence demonstrating that TSO Bergheger unfastened the seat belt, thereby breaching her duty of care. However, "'[t]he fact that only circumstantial evidence is presented on a material issue is no bar to recovery.'" Strong v. American Cyanamid Co., 261 S.W.3d 493, 511 (Mo. Ct. App. 2007) (quoting Sanders v. Hartville Milling Co., 14 S.W.3d 188, 200 (Mo. Ct. App. 2000)). "A plaintiff can prove any essential fact by circumstantial evidence so long as the facts proven and the conclusion to be drawn are of such a nature and so connected that the conclusion may be fairly inferred." Butts v. Express Personnel Servs., 73 S.W.3d 825, 836 (Mo. Ct.

7

App. 2002) (citation omitted). Further, "the existence of such facts cannot depend on guess-work, conjecture or speculation, and the evidence must tend to exclude every reasonable conclusion other than the one desired." Mediq PRN Life Support Servs., Inc. v. Abrams, 899 S.W.2d 101, 107 (Mo. Ct. App. 1994).

TSO Bergheger testified that the waist belt on Deanna Oelzen's wheelchair was fastened at the time of the screening and that she touched the belt buckle but did not unfasten the belt. The undersigned finds this testimony credible. Further, Wayne Oelzen testified that he never checked the belts subsequent to placing Deanna in the wheelchair that morning. With regard to the chest restraint, TSO Bergheger did not notice such belt, and she testified that she never moved Deanna forward or moved any clothing. Indeed, Wayne Oelzen corroborated this by testifying that Deanna's vest was not unzipped, nor were her clothes wrinkled or moved, indicating that no one had tampered with the belts. More importantly, TSO Bergheger testified that she did not unlock the waist belt but that she merely turned it over to see what was on the other side and turned it back. Wayne Oelzen never checked the belts after the screening, and Deanna never mentioned that her belts were unfastened.

Plaintiff argues that the evidence, together with all reasonable inferences and conclusions, demonstrate that Defendant's screening employees unbuckled the wheelchair restraints and caused Deanna Oelzen to become unrestrained. Plaintiff relies on circumstantial evidence in support of his argument. Specifically, Plaintiff claims that the screening employees had every reason and opportunity to unbuckle the restraints to perform a complete security screen of Deanna and her chair; a complete security screen would have required leaning Deanna forward and thus unbuckling her restraints; TSO Bergheger admitted to handling the waist belt; Deanna did not fall out of her wheelchair until after she left the screening area; and Deanna told Mary Ann Herbert that the ladies

8

in security opened them up after they asked her to lean forward.

The undersigned has fully considered Plaintiff's circumstantial evidence, and, while the incident was tragic, the Plaintiff has not met his burden of demonstrating that the Defendant, through TSO Bergheger, breached its duty of care. As previously stated, "[a] plaintiff can prove any essential fact by circumstantial evidence so long as the facts proven and the conclusion to be drawn are of such a nature and so connected that the conclusion may be fairly inferred." Butts v. Express Personnel Servs., 73 S.W.3d 825, 836 (Mo. Ct. App. 2002) (citation omitted).

In the instant case, however, the facts proven and the conclusion proffered by the Plaintiff are not so connected to allow this court to fairly infer that the Defendant breached its duty of care by unfastening, and failing to re-fasten, the waist belt. TSO Bergheger's credible testimony, in conjunction with the fact that Deanna Oelzen's clothing was undisturbed after the screening and the fact that Wayne Oelzen never checked the restraints at the airport do not infer a breach of duty, required to demonstrate wrongful death under a negligence theory. At best, such a conclusion requires speculation on the part of this Court, which is contrary to Missouri law. Mediq PRN Life Support Servs., Inc. v. Abrams, 899 S.W.2d 101, 107 (Mo. Ct. App. 1994). The facts also demonstrate that Wayne Oelzen purchased the wheelchair used several years before the accident and never had the chair inspected for defects. The evidence also shows that the wheelchair came to an abrupt halt in the telescoping section of the jet way, propelling Deanna Oelzen out of her wheelchair and into the air, causing her to hit her head. Just as likely a conclusion is that the force of the impact caused the waist belt to become unfastened.

The undersigned is aware of Deanna's statement to her sister regarding the ladies in security unfastening the belt after she could not lean forward. While the Court previously found the statement

9

admissible, it made no determination regarding credibility for the truth of the matter asserted. Despite this statement, there is no evidence that anyone other than TSO Bergheger screened Deanna Oelzen. Further, Deanna Oelzen could have just as likely been speculating as to how the belt came unbuckled, especially in light of her failure to mention that to her husband or sister prior to going down the jet way. In addition, Deanna Oelzen made the statement after hitting her head and losing consciousness for what "seemed like" a long time. Her statement is simply not direct and competent evidence that Defendant, by and through its employees, breached its duty of care to Deanna Oelzen. Because the Plaintiff, Wayne Oelzen, did not establish at trial that the Defendant, United States of America, through employees of the Transportation Safety Administration, breached its duty of care to Deanna Oelzen, the Court finds in favor of the Defendant on Plaintiff's Wrongful Death action. See Heffernan v. Reinhold, 73 S.W.3d 659, 665 (Mo. Ct. App. 2002) (finding that a plaintiff must establish all elements in order to succeed on a wrongful death claim on a theory of negligence).

Accordingly,

**IT IS HEREBY ORDERED** that Judgment is entered in favor of the Defendant, United States of America, on Plaintiff's Wrongful Death Complaint in federal court under the Federal Tort

Claims Act, 28 U.S.C. §§ 2671 *et seq*. A separate Judgement shall accompany this Memorandum and Order.

/s/ Terry I. Adelman<br>UNITED STATES MAGISTRATE JUDGE

Dated this  23rd  day of September, 2009.